COURT OF CHANCERY
OF THE
STATE OF DELAWARE

SELENA E. MOLINA
SENIOR MAGISTRATE IN CHANCERY

LEONARD L. WILLIAMS JUSTICE CENTER
500 NORTH KING STREET, SUITE 11400
WILMINGTON, DE 19801-3734

February 26, 2026

Sean J. Bellew, Esquire
Bellew LLC
2961 Centerville Road, Suite 302
Wilmington, DE 19808

Arthur G. Connolly, III, Esquire
Connolly Gallagher, LLP
1201 Market Street, 20th Floor
Wilmington, DE 19801

Re: *Genesis CMG Holdings LLC, et al. v. Philip Yancey, et al.*,
C.A. No. 2024-1317-SEM

Dear Counsel:

Pending before me is a motion to dismiss this contract dispute for failure to state a claim. The defendants have been sued for allegedly breaching (or interfering with) restrictive covenants and unit purchase agreements. The problem is most of the allegedly breached restrictions terminated by their own terms by October 28, 2024. Because the gravamen of the operative complaint is that on and after October 31, 2024, the individual defendants breached the then-terminated restrictions (aided by the newly formed entity defendant), the plaintiffs have failed to state a viable claim for relief under their primary theory. And, as more fully explained herein, the remaining claims are not well-pled, and the complaint should be dismissed in full.

This is my final report.

## I.    BACKGROUND

Through this action, Genesis CMG Holdings, LLC ("Genesis") and Converze Media Group, LLC ("Converze," with Genesis, the "Plaintiffs") seek to enforce various restrictive covenants found within restrictive covenant agreements (and incorporated into a related unit purchase agreement) against its former executives, Phillip Yancey and Jennifer Miller-Baten (the "Individual Defendants"), as well as Defendant Yancey's new business, Instinctive Media Group, LLC  ("Instinctive," together with the Individual Defendants, the "Defendants").[1]

Here, at the pleading stage, I take the well-pled averments of fact in the Plaintiffs' amended complaint as true.

### A.    The Transaction

Prior to October 2023, the Defendants were affiliated with Converze, a direct response media purchasing agency, which works with businesses that seek to advertise on television and radio.[2] Through its work, Converze assists its clients by developing advertising strategies and securing strategic advertising opportunities.[3] Defendant Yancey was the founder, a former executive, and 45% equity holder of

---

[1] Docket Item ("D.I.") 18 ("Am. Compl.").

[2] *Id.* ¶ 9.

[3] *Id.*

Converze.[4] Defendant Miller-Baten was also a former executive and 10% equity holder of Converze.[5] That was until October 27, 2023, when the Defendants executed a Unit Purchase Agreement (the "UPA") to sell their interests in Converze to Genesis.[6]

Through the UPA, the Defendants (and a nonparty seller) transferred all their interests in Converze to Genesis, under which Converze would continue to operate. In connection with the UPA, Converze agreed to make certain payments to the Defendants (and the third, non-party equity holder), and Genesis executed promissory notes agreeing, in pertinent part, to pay Defendant Yancey $4,325,000 and Defendant Miller-Baten $450,000 (the "Seller Notes").[7] Those amounts were reduced to $2,476,221.23 and $226,813.33, respectively, per an April 29, 2024 settlement agreement.[8] Converze also issued a loan to Defendant Yancey (and the

---

[4] *Id.* ¶ 10; D.I. 4 Ex. 1 ¶ 2.

[5] Am. Compl. ¶ 10.

[6] *Id.* Although not attached to the amended complaint, the UPA was filed in connection with earlier motion practice and is considered herein as incorporated by reference. *See In re Morton's Restaurant Grp., Inc. S'holders Litig.*, 74 A.3d 656, 658 n.3 (Del. Ch. 2013) ("[T]he court may consider documents that are incorporated by reference or integral to the complaint.") (internal quotations omitted). *See* D.I. 4 Ex. A.

[7] Am. Compl. ¶ 11.

[8] *Id.*

non-party equity holder) on the same day as the UPA (the "Shareholder Loans").[9]

In connection with the transaction, the Defendants also executed Restrictive Covenant Agreements (the "RCAs") with Genesis, which were a condition to the closing and consummation of the transaction.[10] The RCAs contained non-competition, non-solicitation, and confidentiality clauses governing the Individual Defendants' conduct post-transaction (after October 27, 2023). Those restrictions, and whether the Defendants violated them, are at issue in this action.

## B. The Restrictions

Under Sections 1–4 of the RCA for Defendant Yancey, Defendant Yancey agreed to: (1) not compete for four years anywhere within the United States, (2) not solicit any Converze customers for two years, (3) not solicit any Converze employees for four years, and (4) keep all Converze's confidential information confidential and not use or appropriate it.[11] For Defendant Miller-Baten, the restrictive periods were altered such that the non-competition was only for one year and the non-solicitation provisions were both for two years.[12]

---

[9] *Id.* ¶ 13. Section 8.10 of the UPA provides that the "shareholder loans will not be payable and will be cancelled at the time the seller notes become due and payable (or such other time agreed to by [Genesis] . . . and [Yancey]." *Id.* ¶ 26. Miller-Baten was not part of the Shareholder Loans. D.I. 22 ("Defs.' Opening Br.") at 14.

[10] Am. Compl. ¶¶ 14, 39.

[11] Am. Compl. Ex. A, §§ 1–4.

[12] Am. Compl. Ex. B, §§ 1–4.

The RCAs specified that the written agreement "constitutes the entire Agreement among the parties" and that any amendments, modifications, or waivers in connection therewith could only be made "by a written agreement signed by" the Defendant party to the agreement and Genesis.[13]

The RCAs also have an "out" through which restrictions (1)–(3) above would automatically terminate. Section 22 of the RCAs provides:

> Adjustment to Restricted Period. Notwithstanding anything to the contrary herein, if, following the first anniversary of the Effective Date, any of the Seller Notes (as defined in the Purchase Agreement) or the Earnout Payment (as defined in the Purchase Agreement) remain unpaid for any reason, and regardless of whether the payment is delayed or restricted by the Subordination Agreement (as defined in the Purchase Agreement) or the Senior Credit Agreement (as defined in the Purchase Agreement) or as a result of any Default or Event of Default thereunder, then Sections 1, 2, and 3 of this Agreement shall terminate and be of no further force or effect."[14]

With the "Effective Date" of October 27, 2023, this provision provided that the non-competition and non-solicitation restrictions would terminate by October 28, 2024 if, by that date, the Seller Notes (as defined in the UPA) were unpaid. Article IX of the UPA defines Seller Notes as: "those certain subordinated promissory notes in the aggregate principal amount of $8,500,000 to be issued by [Genesis] to the

---

[13] Am. Compl. Ex. A, §§ 11, 13, 18; Ex. B, §§ 11, 13, 18.

[14] Am. Compl. Ex. A at 8; Ex. B at 8.

Members[,]" a defined term which includes the Individual Defendants.[15] This tracks in all material respects how I have defined Seller Notes herein.

Under this definition, by October 28, 2024, the Seller Notes remained unpaid. The Plaintiffs plead only that Defendant Miller-Baten's note was paid and concede that Defendant Yancey's was not.[16] The Plaintiffs aver, however, that the parties "agreed" to offset the Seller Notes which remained unpaid against the Shareholder Loans, which were greater than the remaining amount owed on the Seller Notes.[17] Absent from the operative pleading, however, are any details as to that purported agreement (e.g., the date and terms of any offer, acceptance, or counteroffer).[18]

### C.    The Alleged Breaches

Relying upon the theory that the restrictions did not terminate under Section 22 and pointing to the non-terminating confidentiality restrictions, the Plaintiffs allege that the Defendants breached their obligations under the RCAs "[s]ince at least October" of 2024 in connection with their work with Instinctive.[19]

Defendant Yancey formed Instinctive on October 31, 2024.[20] He and

---

[15] D.I. 4 Ex. A, art. IX.

[16] *See* Am. Compl. ¶ 28.

[17] *Id.* ¶ 25.

[18] *Id.*

[19] *Id.* ¶ 19.

[20] *Id.* ¶ 5.

Defendant Miller-Baten are alleged to have created Instinctive "to directly compete with" Converze and have solicited several of Converze's employees and clients.[21] The Plaintiffs further allege that these competitive activities have involved the misuse of Converze's confidential information and resulted in financial harm to Converze's ongoing business post-transaction, through the loss of clients and employees.[22]

### D.    Procedural Posture

The Plaintiffs filed their initial complaint on December 19, 2024, along with a motion to expedite and motion for a temporary restraining order.[23] Vice Chancellor Fioravanti denied those motions on December 31, 2024.[24] The Plaintiffs then filed their amended complaint on February 18, 2025 (the "Amended Complaint").[25] In the Amended Complaint, which is the operative pleading, the Plaintiffs pled three counts: Count I for breach of contract, Count II for breach of the implied covenant of good faith and fair dealing, and Count III for tortious interference with contract.

On March 21, 2025, the Defendants moved to dismiss the Amended

---

[21] *Id.* ¶ 19.

[22] *Id.* ¶¶ 19, 30–33.

[23] D.I. 1.

[24] D.I. 12–14.

[25] D.I. 18.

Complaint (the "Motion").[26] Vice Chancellor Fioravanti approved the parties' briefing schedule, which contemplated the parties completing briefing on the Motion in July 2025.[27] Thereafter, on October 6, 2025, the Chancellor reassigned this action to me.[28] I heard argument on December 9, 2025, and took the Motion under advisement.[29]

## II.    ANALYSIS

Through the Motion, the Defendants seek dismissal for failure to state a claim under Court of Chancery Rule 12(b)(6).[30] The Defendants make several arguments including that: (1) the claims in the Amended Complaint mirror those already deemed not colorable by the Vice Chancellor; (2) the non-competition and non-solicitation restrictions terminated by their own terms prior to the alleged breaches; (3) the Plaintiffs failed to plead factual averments supporting the alleged confidentiality breaches; (4) the Plaintiffs failed to plead a gap supporting an implied covenant claim; (5) absent actionable breaches, there is no actionable tortious interference claim; and (6) the restrictions are overbroad and unenforceable.

---

[26] D.I. 22.

[27] D.I. 26.

[28] D.I. 35.

[29] D.I. 37.

[30] D.I. 22 at 1; Defs.' Opening Br. at 10.

As more fully explained below, I agree with the Defendants as to (2), (3), (4) and (5). With those holdings, I need not reach (6). I also disagree with the proposition in (1), that the Vice Chancellor's colorability analysis is binding on my pleading-stage review. Well-reasoned as it was, it has little, if any, weight at this stage and the Vice Chancellor forecasted as much.[31] Nevertheless, I conclude that the Amended Complaint should be dismissed for failure to state a claim.

The standard for dismissal under Rule 12(b)(6) is settled:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are well-pleaded if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and [iv] dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.[32]

Although this is a plaintiff-friendly standard, the Court does not "simply accept conclusory allegations unsupported by specific facts, nor do we draw unreasonable inferences" in favor of the pleader.[33]

---

[31] D.I. 17 at 51:9–19 ("And I note for the sake of clarity that my ruling today does not constitute a final resolution of the plaintiffs' claims. Before me today are a motion to expedite, which is a scheduling motion, and a motion for a temporary restraining order, which is a discrete request for extraordinary injunctive relief. It is on these motions that I rule today. And my ruling today provides only that this case shall proceed on a normal schedule and that the plaintiffs are not entitled to extraordinary relief on this preliminary record.").

[32] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (quotation marks and citations omitted).

[33] *Clinton v. Enter. Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009).

The primary claim in the Amended Complaint is for breach of contract in Count I. I hold that the Plaintiffs failed to state a claim for breach of contract in Count I, vitiating Count III for tortious interference, and that the Plaintiffs failed to identify the gap necessary for the implied covenant claim in Count II to survive.

## A.    The Plaintiffs have not adequately pled that the Defendants breached the RCAs.

The Plaintiffs aver that the Defendants breached the restrictive covenants in the RCAs by competing, soliciting, and using confidential information. The non-competition and non-solicitation restrictions, however, terminated by their own terms prior to the alleged breaches. And the alleged misuse of confidential information is not supported by any well-pled facts. The Plaintiffs, thus, failed to state a claim in Count I.

Generally, "[i]n order to survive a motion to dismiss for failure to state a breach of contract claim, the plaintiff must demonstrate: first, the existence of the contract . . . second, the breach of an obligation imposed by that contract; and third, the resultant damage to the plaintiff."[34] In interpreting the obligations imposed by a contract, "Delaware law adheres to an objective theory of contracts, under which a court will not consider extrinsic evidence to 'interpret the intent of the parties, to

---

[34] *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del.2003) (citing *Winston v. Mandor*, 710 A.2d 835, 840 (Del. Ch. 1997)).

vary the terms of the contract or to create an ambiguity' when the relevant contract terms are unambiguous."[35] Rather I look to the four corners of the RCAs and interpret the plain meaning of their provisions.[36]

Here, there is no dispute that the parties executed the RCAs, which imposed restrictions upon the Defendants. Those restrictions, in Sections 1–4, are unambiguous. But, also unambiguous, are the integration, modification, and automatic termination provisions. That is the first problem with the Plaintiffs' breach of contract claim, specifically for the alleged breaches of Sections 1–3.

The RCAs have non-competition and non-solicitation restrictions in Sections 1–3. But Section 22 of the RCAs provides that those restrictions "shall terminate and be of no further force or effect[,]" if the Seller Notes remain unpaid on the first anniversary of the agreement's effective date. "Seller Notes" is defined in the RCAs to mean all the Seller Notes, as a collective unit, rather than solely the note for the individual signing each of the RCAs. Thus, the Plaintiffs' pleading concession that Defendant Yancey's note remains unpaid impacts both of the RCAs.

---

[35] *Revolution Retail Sys., LLC v. Sentinel Techs., Inc.*, 2015 WL 6611601, at *9 (Del. Ch. Oct. 30, 2015), judgment entered, (Del. Ch. 2015), and order clarified, (Del. Ch. 2015).

[36] *See Thompson St. Cap. P'rs IV, L.P. v. Sonova U.S. Hearing Instruments, LLC*, 340 A.3d 1151, 1166 (Del. 2025).

To avoid as much, the Plaintiffs pled that the parties "agreed" to offset the Seller Notes against the Shareholder Loans. But that purported agreement is outside the four corners of the RCAs, which are unambiguous and contain clear integration clauses providing that the RCAs contain the entire agreement. The RCAs also have clear modification clauses providing that any changes thereto needed to be in writing signed by both parties. Given the Plaintiffs' admission that the Seller Notes remained unpaid by October 27, 2024 and absent any averments that the alleged agreement to offset the Shareholder Loans was memorialized in signed writing, the only reasonable interpretation of the RCAs is that the non-competition and non-solicitation restrictions terminated by October 28, 2024.[37]

---

[37] In briefing, the Plaintiffs emphasized that communications about the Shareholder Loans offset were in written email communications. *See, e.g.*, D.I. 23 ("Pls.' Answering Br.") at 13. But it is not reasonable to interpret the modification clauses, which require "a written agreement signed by" the parties, to permit modification by email communications. *See* Am. Compl. Ex. A, §§ 11, 13; Ex. B, §§ 11, 13. *Cf. Kokorich v. Momentus Inc.*, 2023 WL 3454190, at *9–10 (Del. Ch. May 15, 2023), *aff'd*, 308 A.3d 1192 (Del. 2023), and *aff'd*, 308 A.3d 1192 (Del. 2023) (rejecting a theory that an email reflecting the party "will agree" to a modification was an effective modification of an agreement that required modifications in writing and signed by both parties); *Zutrau v. Jansing*, 2014 WL 7013578, at *1–2 (Del. Ch. Dec. 8, 2014), *aff'd*, 123 A.3d 938 (Del. 2015) (holding that email communications did not effectively modify an agreement that required modifications to be in "a subsequent writing executed by the parties"). Because the email communications could not effectively modify the RCAs, the parties' seeming dispute about what they reflect is irrelevant; the Plaintiffs' claims fail. *See* Pls.' Answering Br. at 14.

The Plaintiffs also argued that Section 22 is, at most, a condition precedent and that further analysis is needed to determine materiality. For this argument, the Plaintiffs rely on the Delaware Supreme Court's decision in *Thompson Street*. 340 A.3d 1156. Therein, the Delaware Supreme Court emphasized that "Delaware is a contractarian state, but our common law abhors a forfeiture." *Id.* at 1156. It explained, "[c]onditions precedent that

To state a viable breach of contract claim, the Plaintiffs, thus, needed to plead factual predicate supporting a reasonably conceivable theory that the Defendants competed and solicited prior to October 28, 2024. They failed to do so. In the Amended Complaint, the Plaintiffs pled that the Individual Defendants' conduct was "[s]ince at least October" of 2024.[38] But all the challenged conduct was directly in connection with Instinctive, which was not formed until October 31, 2024. In the Plaintiffs' own theory of the case, the Individual Defendants violated their restrictive covenants by: "establishing a competing entity, violating a noncompetition clause, a non-solicitation of customers clause, a non-solicitation of employees clause, and a

---

trigger forfeitures create a tension in contract law. On the one hand, Delaware is a contractarian state that holds parties' freedom of contract in high regard. On the other hand, our common law generally disfavors forfeitures." *Id.* at 1168. Thus, when reviewing a contract claim, particularly at the pleading stage, trial courts were cautioned "to look to whether the language clearly provides for a forfeiture. If the language does not clearly provide for a forfeiture, then a court will construe the agreement to avoid causing one. If the language clearly provides for a forfeiture, then a court may consider whether compliance with the condition may be excused in accordance with the criteria discussed" later in the decision. *Id.* For such criteria, the court looked to the Restatement (Second) of Contracts, adopting its language that: "the Court may excuse the nonoccurrence of a condition that would cause a disproportionate forfeiture unless its occurrence was a material part of the agreed Exchange." *Id.* at 1169 (citation omitted).

I have carefully considered the Supreme Court's thoughtful exploration of conditions precedent in *Thompson Street*. It further supports my holding herein. Section 22 is an express condition precedent, and a material part of the parties' agreements reflected in the RCAs. The language agreed to by the parties clearly provides for a forfeiture and eschews any future excusal in clear and unambiguous terms. There is no need nor basis for further factual development.

[38] Am. Compl. ¶ 19.

confidentiality clause."[39] There are no well-pled facts in the Amended Complaint from which I can infer pre-termination conduct sufficient for the Plaintiffs to state a viable breach of contract claim.

That leaves Section 4, the confidentiality restrictions in the RCAs. These restrictions did not automatically terminate and continue to bind the Individual Defendants. But the Plaintiffs have failed to state a cognizable claim that the Individual Defendants misused or appropriated Converze's confidential information.

The only averment regarding confidentiality provides that the Individual Defendants' "unlawful solicitations also involved the use of Confidential Information[.]"[40] The Plaintiffs seek an inference that, because certain identified clients of Converze signed with Instinctive, the Individual Defendants must have used Converze's confidential information.[41] They argue "[i]n order to approach these Converze clients," the Individual Defendants necessarily relied upon Converze confidential information including customer lists, client requirements, and terms of contracts with clients and customers.[42]

---

[39] D.I. 23, p. 12.

[40] Am. Compl. ¶ 19.

[41] Pls.' Answering Br. at 27.

[42] *Id.*

This is not, however, a reasonable inference from the pleadings. To draw this inference would conflate the distinct obligations in Section 1–3 and Section 4. And it would bless conclusory allegations, which fail to provide notice of how the Individual Defendants allegedly breached the confidentiality clauses. For example, the Plaintiffs failed to identify the specific information that remained in the Individual Defendants' possession and the attributes of that information which would support a reasonably conceivable claim that it is within the definition of "Confidential Information" in the RCAs. Absent that factual predicate, the Plaintiffs' averments fail to state a reasonably conceivable claim that the Individuals had, and misused, "Confidential Information" in violation of Section 4 of the RCAs.[43]

All told the Plaintiffs have failed to plead that the Defendants breached any binding restrictive covenants in the RCAs. Count I should be dismissed on that basis. With this holding, I need not reach the Defendants' alternative arguments for dismissal of the contract claim, and I can easily dispose of the tortious interference claim in Count III. In Count III, the Plaintiffs allege Instinctive knew of the RCAs and UPA and acted as the corporate vehicle through which the Individual Defendants breached their contractual obligations. With no viable breach of contract, Count III, too, fails.

---

[43] *See Kalkomey Enters., LLC v. Strobl*, 2026 WL 129295, at *4 (Del. Ch. Jan. 16, 2026).

**B.    The Plaintiffs have not pled a cognizable implied covenant claim.**

The final claim that remains in the Amended Complaint is Count II, through which the Plaintiffs allege that Defendant Miller-Baten breached the implied covenant of good faith and fair dealing implicit in the RCAs, UPA, and Genesis' LLC operating agreement.

"To sufficiently plead breach of the implied covenant of good faith and fair dealing, a complaint 'must allege a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff.'"[44] As explained recently by Vice Chancellor Cook, "our case law suggests there are two strains of the implied covenant: (1) gap-filling and (2) protecting against arbitrary and bad faith exercise of discretion."[45] Here, with no discretionary obligations at issue, I presume we are in gap-filling territory. Thereunder, "the implied covenant is implicated when an agreement is truly silent on a term and requires a party to identify a gap in the contract to state a claim."[46] It "exists to fill contractual gaps that neither

---

[44] *Sheehan v. AssuredPartners, Inc.*, 2020 WL 2838575, at *11 (Del. Ch. May 29, 2020) (internal quotations omitted).

[45] *Osios LLC v. Tiptree, Inc.*, 2024 WL 2947854, at *5 (Del. Ch. June 12, 2024) (citations omitted).

[46] *Id.* (citations omitted).

party anticipated[,]" and "protects an agreement's spirit against underhanded tactics that deny a party the fruits of its bargain."[47]

The Plaintiffs have failed to identify any contractual gap sufficient to plead an implied covenant claim. Count II, on its face, is deficient. It provides, in conclusory fashion, that the implied covenant is inherent in all contracts, Defendant Miller-Baten was a party to several contracts, and that her challenged conduct (the alleged competition, solicitation, and use of confidential information) breached that covenant. Count II fails to state a cognizable implied covenant claim and should be dismissed.

## III. CONCLUSION

For the above reasons, the Motion is granted, and this action should be dismissed with prejudice. This is a final report under Court of Chancery Rule 144.

Respectfully submitted,

*/s/ Selena E. Molina*

Senior Magistrate in Chancery

---

[47] *Sheehan*, 2020 WL 2838575, at *11.